**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KYRE PAUL ANTHONY BROWN,<br><br>Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO. 1:26-CV-39<br><br>MAGISTRATE JUDGE<br>JENNIFER DOWDELL ARMSTRONG<br><br>**MEMORANDUM OPINION AND ORDER** |

## I. INTRODUCTION

The Commissioner of Social Security denied Plaintiff Kyre Paul Anthony Brown's application for a period of disability, Disability Insurance Benefits (DIB), and Supplemental Security Income. Mr. Brown seeks judicial review of that decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c). (Compl., ECF No. 1.) The parties have consented to a magistrate judge exercising jurisdiction over the case pursuant to 28 U.S.C. § 636(c), Rule 73 of the Federal Rules of Civil Procedure, and Local Rule 73.1. (Consents and Order, ECF No. 6.)

For the reasons set forth below, the Court AFFIRMS the Commissioner's final decision.

## II. PROCEDURAL HISTORY

In December 2022, Mr. Brown applied to the Social Security Administration (SSA) seeking a period of disability, DIB benefits, and SSI benefits, claiming that he became disabled on November 14, 2022 (for SSI) and December 31, 2021 (for DIB). (Tr. 343, 350.)[1] He identified two allegedly disabling conditions: (1) schizophrenia; and (2) paranoia. (Tr. 386.)

---

[1] The administrative transcript appears at ECF No. 7. I will refer to pages within the transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 28"). I will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 8") and page-identification numbers (e.g., "PageID# 665").

The SSA denied Mr. Brown's application initially and upon reconsideration. (Tr. 83, 93, 103, 115.) Mr. Brown requested a hearing before an administrative law judge (ALJ). (Tr. 181–82.) The ALJ wrote[2] that she held a hearing on November 13, 2023, at which Mr. Brown was represented by counsel and at which he and a vocational expert provided testimony. (Tr. 130).

On January 23, 2024, the ALJ issued a written decision finding that Mr. Brown was not disabled. (Tr. 127–47.)

On January 2, 2025, the SSA Appeals Council vacated the hearing decision and remanded the matter back to the ALJ. (Tr. 148–51.) The Appeals Council found that the jobs the ALJ cited at Step Five were inconsistent with the residual functional capacity. (Tr. 151.)[3]

The ALJ held a second hearing on June 2, 2025, at which Mr. Brown was represented by counsel. (Tr. 34–59.) Mr. Brown testified, as did an independent vocational expert (VE). (*Id.*) Mr. Brown's counsel submitted a letter brief in advance of the hearing. (Tr. 493–95.)

On July 11, 2025, the ALJ issued another written decision finding that Mr. Brown was not disabled. (Tr. 7–28.) Mr. Brown requested review of the ALJ's decision.

---

[2] The transcript from this hearing is not in the administrative record, but neither party relies upon any testimony offered at this hearing in support of their arguments or assigns an error from the absence of this transcript from the record. Accordingly, the Court need not dwell on the matter. *See, e.g.*, *Anthony v. Astrue*, 266 F. App'x 451, 458 (6th Cir. 2008) (issues adverted to only in a perfunctory manner are waived); *c.f. Parker v. Comm'r of Soc. Sec.*, No. 5:16 CV 278, 2017 WL 2859801 (N.D. Ohio May 9, 2017) (the Court is not an advocate for a claimant but an impartial adjudicator), *report and recommendation adopted*, 2017 WL 2840763 (July 3, 2017).

[3] The ALJ had found Mr. Brown capable of performing the work of a hospital cleaner and cleaner II, but those positions require occasional climbing and include tasks involving the use of ladders, despite the ALJ limiting Mr. Brown to no climbing of ladders. (Tr. 150.) Additionally, the ALJ had found Mr. Brown capable of performing the work of a kitchen helper, which requires frequent crouching, despite finding Mr. Brown limited to occasional crouching. (*Id.*) And finally, the kitchen helper position requires tasks like cleaning windows with water and cleansing compounds and utilizing steam-cleaning equipment or spraying equipment, which may have been inconsistent with the environmental limitations expressed in the original residual functional capacity. (*Id.*) Mr. Brown does not raise an alleged error in this appeal about the ALJ's resolution of these issues on remand.

On November 14, 2025, the Appeals Council denied review, rendering the ALJ's decision the Commissioner's final decision in the matter. (Tr. 1.)

Mr. Brown filed his Complaint on January 7, 2026, challenging the Commissioner's final decision that he is not disabled. (ECF No. 1.) Mr. Brown asserts the following assignments of error for review:

> **First Assignment of Error:** The ALJ erred at Step Three of the sequential evaluation when she failed to find that Plaintiff satisfied the criteria of Listing 12.03.
>
> **Second Assignment of Error:** The ALJ erred when she failed to properly apply the criteria of Social Security Ruling 96-8p and consider Plaintiff's schizophrenia and related limitations when forming the RFC.

(Pl.'s Merits Br. at 7, 15, ECF No. 8, PageID# 665, 673.)

## III. BACKGROUND

### A. Prior Application for Benefits

Mr. Brown previously applied to the SSA for SSI in December 2019, alleging disability beginning on November 13, 2019. (Tr. 67.) An ALJ issued a decision finding Mr. Brown not disabled on March 8, 2021. (Tr. 64–78.)

### B. Personal, Educational, and Vocational Experience

Mr. Brown was born in 1998 and was 24 years old on the date of his application. (*E.g.*, Tr. 343.) He graduated from high school, utilizing an individualized education program with respect to certain school subjects like reading and math. (Tr. 42, 387.) He has not worked since September 2022. (Tr. 387, 400.) He has some experience in assembly-line factory work, as a cashier in retail establishments, as a preparation cook in a fast food restaurant, and as a laborer fixing up houses and doing landscaping work. (Tr. 42–45, 387, 407.) He has never held a driver's license. (Tr. 42.)

### C. **Function Reports**

Mr. Brown's mother completed a function report with respect to Mr. Brown on January 28, 2023. (Tr. 420–27.) She wrote that Mr. Brown "hears voices" and has a hard time focusing. (Tr. 420.) Sometimes, "any noise" will make him "very paranoid." (*Id.*) He does not like being around other people. (*Id.*)

On a typical day, Mr. Brown will stay in his bedroom and sleep all day. (Tr. 421.) He will help around the house "if [his mom] keep[s] at him about it," but otherwise he will stay in his room and avoid doing family activities. (*Id.*) He does not bathe himself; his mom has to "almost pull him to bathe." (*Id.*) He needs reminders to care for his hair and to shave. (*Id.*) But he is able to feed himself and use the restroom independently. (*Id.*) His mom reminds him to take a shower, brush his teeth, and put on deodorant. (Tr. 422.) She has to "make him" go to the doctor for his medication injections. (*Id.*) Mr. Brown's mother makes most of his meals for him. (*Id.*) He makes himself a simple meal like sandwiches and cereal around three or four times a month,. (*Id.*)

Mr. Brown is able to mow the lawn, but he only does so when his mother "make[]s him." (*Id.*) He cleans his room when she "keep[s] asking him" to do so. (*Id.*) He and his mother walk to the store together often, but he does not like to go out because he is paranoid. (Tr. 423.) He does not drive and "refuses to learn." (*Id.*) He used to have hobbies, but now he keeps to himself and sleeps a lot (Tr. 424.) His attention span is "very short." (Tr. 425.) He does not follow instructions well and "gives up quickly." (*Id.*)

Mr. Brown's mother wrote that she observes that Mr. Brown is "getting worse." (Tr. 427.) He wears the same clothes for weeks, and he sometimes brings strangers home, which frightens her. (*Id.*)

In April 2023, Mr. Brown's representative told the agency that his condition had deteriorated since January 2023 because he was "having conversations with himself" and was "behaving like a child again"; he was "confused." (Tr. 429, 431.)

### D. <u>Relevant Hearing Testimony</u>

#### 1. *Mr. Brown's Testimony*

Mr. Brown testified in June 2025 that he lives in an apartment with his mother. (Tr. 41.) When he needs to travel, most often his oldest brother will take him where he needs to go. (Tr. 42.) He said he has held short-term jobs now and then, but he had trouble being outside the home by himself and did not like the "loud noises" involved in some of his work. (Tr. 45.) He described noises, like cars driving by or people closing doors, as "triggers." (*Id.*) He finds himself becoming "timid," like "a little kid in a sense." (*Id.*) He had recently missed a friend's funeral because he could not get himself to go. (*See id.*)

On a typical day, Mr. Brown spends most of his time by himself in a room. (Tr. 47.) His siblings visit him, but he finds interacting with them to be "awkward." (*Id.*) He exercises by himself every day. (*Id.*) He used to go to a public gym with his brother, but going out grew to be too much for Mr. Brown. (*Id.*) He will typically make up his bed, and he is able to fold clothes and clean the bathroom "a little bit." (Tr. 48.) He is able to cook for himself sometimes. (*Id.*) He showers a couple times a week. (*Id.*) He has no problems getting dressed. (Tr. 48–49.) Mr. Brown has friends with whom he interacts through calls and text messages. (Tr. 49.)

Mr. Brown receives an injection once every other month for his mental health conditions. (Tr. 49.) His medication works "for the most part," but he still hears voices "here and there." (*Id.*) Mr. Brown said that he sometimes forgets to turn the stove off after he cooks. (Tr. 50.)

### 2. *Vocational Expert's Testimony*

George Coleman testified as a vocational expert ("VE") at the second hearing. (Tr. 51.) The VE classified Mr. Brown's past relevant work into four distinct positions: gas station cashier (DOT 290.477-014); factory laborer (DOT 922.687-058); landscape laborer (DOT 406.687-010); and brush painter (DOT 740.684-022). (Tr. 51–52.)

The ALJ asked the VE to assume that a hypothetical individual with Mr. Brown's age, education, and work experience is capable of work at the medium exertional level, with additional limitations. (Tr. 52.) Specifically, the person can never climb ladders, ropes, or scaffolds but can occasionally climb ramps and stairs. (*Id.*) He can occasionally kneel, crouch, and crawl. (*Id.*) He should avoid concentrated exposure to extreme heat and humidity. (*Id.*) He should avoid unprotected heights and the operation of heavy or dangerous machinery. (*Id.*) He should avoid very loud noises. (*Id.*) He can understand, carry out, and remember simple instructions but cannot perform work requiring a specific production rate pace or an hourly production quota. (*Id.*) He can meet production requirements that allow for a flexible and goal-oriented pace. (*Id.*) He can retain the focus, persistence, concentration, pace, and attention to engage in tasks for two-hour increments in an eight-hour workday within the confines of normal work breaks and lunch periods, and he can deal with occasional changes in a routine work setting. (*Id.*) He can tolerate occasional and superficial interaction with supervisors and coworkers, with "superficial" meaning that he is unable to mediate, negotiate, arbitrate, confront, or direct or supervise others. (Tr. 52–53.) He cannot engage in tandem tasks and should have no interaction with the public. (Tr. 53.)

The VE testified that such an individual could not perform Mr. Brown's past relevant work but could perform the work of a sandwich maker (DOT 317.664-010), kitchen helper (DOT 217.687-010), or linen room attendant (DOT 222.387-010). (Tr. 54–55.)

The ALJ next asked the VE to assume that the person was further limited, in that they could only work at the light exertion level. (Tr. 53.) The VE testified that such a person could perform the work of a mailroom clerk (DOT 209.687-026), office helper (DOT 239.567-010), or cafeteria helper (DOT 311.677-010). (*Id.*)

The VE testified that an employer will tolerate time off task of up to 10 percent. (*Id.*) An employee can be absent once per month. (*Id.*)

In response to questions by Mr. Brown's counsel, the VE testified that it would be incompatible with competitive employment if an employee required redirection for up to a third of the workday. (Tr. 58.)

**E. <u>State Agency Consultants</u>**

A disability examiner (Katherine Kruse), a physician (Sai Nimmagadda, M.D.), and a psychologist (Irma Johnston, Psy.D.) reviewed Mr. Brown's claim at the initial review level in February and March 2023. (Tr. 83–92.)

Dr. Johnston opined that Mr. Brown had a mild limitation in his ability to understand, remember, or apply information; a marked limitation in his ability to interact with others; and moderate limitations in his ability to concentrate, persist, or maintain pace and to adapt or manage himself. (Tr. 87.) Dr. Johnston found that Mr. Brown could "perform routine tasks in a low stress environment (no fast pace, strict production quotas or frequent duty changes) involving superficial interpersonal interactions with coworkers and supervisors (no arbitration, negotiation, or confrontation), and no interaction [with] the public as a job requirement." (Tr. 91)

Dr. Nimmagadda opined that Mr. Brown could perform a full range of work at all exertional levels, except that he must avoid exposure to hazards like heights, machinery, and commercial driving. (Tr. 88.) He also opined on certain postural and environmental limitations. (Tr. 89–90.)

Based on these opinions, the consultants determined that Mr. Brown retained the ability to perform the work of a hot-stone setter, stuffer, or silver wrapper and was not disabled. (Tr. 91–92.)

In a letter explaining the decision to Mr. Brown, the agency wrote that the evidence showed that he remains "capable of performing some types of work activities which were less demanding in nature." (Tr. 165.)

In May and June 2023, at the reconsideration level, a different disability examiner (Jessica Baldwin), physician (Timothy Honigman), and psychologist (Audrey Todd, Ph.D.) reviewed Mr. Brown's claim. (Tr. 103–15.)

Dr. Todd found that the initial-level decision should not be affirmed because the medical evidence reflecting Mr. Brown's functioning after receiving injection medication supported different limitations. (Tr. 112.) She pointed out, among other things, that Mr. Brown had been working a demolition and construction job and reported in April 2023 that he denied feeling depressed or irritable and was able to enjoy things and laugh about things. (*Id.*)

Dr. Todd opined that Mr. Brown had a mild limitation in his ability to understand, remember, or apply information and moderate limitations with respect to the other Paragraph B criteria. (Tr. 107.) She found that Mr. Brown showed no evidence of limitation with respect to his ability to remember locations and work-like procedures or to understand and remember short and simple instructions. (Tr. 110.) He was not significantly limited in his ability to understand and remember detailed instructions, either. (*Id.*) He had a number of moderate limitations with respect to his ability to concentrate and persist, but Dr. Todd found that he can concentrate, persist, and maintain pace to carry out a simple learned routine in a structured and predictable work setting. (Tr. 110–11.) He had moderate limitations in all areas of social interaction, but Dr. Todd opined that he retained the ability to interact with coworkers, supervisors, and the general public

occasionally and superficially. (Tr. 111.) Dr. Todd wrote that Mr. Brown would be able to adapt and manage himself in a structured and predictable work setting where changes can be explained. (*Id.*)

Dr. Honigman affirmed the initial level findings as it relates to Mr. Brown's physical limitations. (Tr. 110.)

Based on these opinions, the consultants determined that all the jobs identified at the initial level remained available to Mr. Brown, and he is not disabled. (Tr. 113.)

In a letter to Mr. Brown explaining that decision, the agency wrote that his current examinations "show that [he is] able to understand and carry out simple and routine tasks, interact briefly with others, and care for [his] basic needs." (Tr. 176.)

**F. <u>Relevant Medical Evidence</u>**

On March 24, 2021, Mr. Brown treated with Rachael McLaughlin, a nurse practitioner, based on a diagnosis of schizophrenia. (Tr. 502.) Mr. Brown reported that he had been experiencing auditory hallucinations for the past few weeks, but he was able to recognize that the voices are not real. (*Id.*) He said that he had been pulling his hair out of his face. (*Id.*) He reported being engaged with others, working out with his brother, helping around the house, playing video games, listening to music, and sleeping well at night. (*Id.*) He denied being paranoid or feeling depressed or aggressive. (*Id.*) He said he was interested in working again and had been studying for his driver's license, although he was nervous that he may start hearing voices again. (*Id.*) Ms. McLaughlin noted gradual improvement in Mr. Brown's symptoms, and he was continued on his medication. (*Id.*)

When Mr. Brown followed up with Ms. McLaughlin on April 28, 2021, he denied hearing hallucinations since his last appointment. (Tr. 508.) He was continuing to engage with others, and he felt his stamina was improving. (*Id.*) He no longer needed noise cancelling headphones, and his

activities of daily living remained the same as previously reported. (*Id.*) He was continued on his injection medication. (*Id.*)

Mr. Brown had a telephone appointment with Ms. McLaughlin on February 18, 2022. (Tr. 540.) He again reported that he had not been hearing voices. (*Id.*) He sometimes helped his friends move. (*Id.*) He said he had intermittent anxiety and paranoia, but he was able to leave the house without an issue for the most part. (*Id.*) He again denied feeling depressed or irritable. (*Id.*) He was able to enjoy things and laugh. (*Id.*) He had not been working out with his brother lately, but he continued to play video games and listen to music. (*Id.*) He was getting along well with family and talked to a friend "[here] and there." (*Id.*)

In June 2022, Mr. Brown was noted to be prediabetic, although he was making lifestyle changes and reducing his weight. (Tr. 524.) He had dermatitis and hidradenitis suppurativa. (*Id.*) He had multiple recurring large cysts on his inner thigh, and during the examination he was noted to have multiple raised cysts on the thighs and a rash on his left arm. (Tr. 524, 526.)

At a telephone appointment with Ms. McLaughlin on December 29, 2022, Mr. Brown said that he was managing "just fine" on his medication. (Tr. 511.) When he was late receiving his medicine, he would experience auditory hallucinations, but "nothing intolerable." (*Id.*) He said he had spent the summer working. (*Id.*) He sometimes felt anxious or overwhelmed, but he was able to deal with those feelings through quiet and relaxation. (*Id.*) His mother reported that she was concerned about the people Mr. Brown was associating with, who took Mr. Brown to a "dope house" and had "control over him." (*Id.*) She reported that he had not been bathing or wearing appropriate clothing, was not working beyond "fixing up houses" with these "bad people," and could be using marijuana again. (*Id.*)

On February 23, 2023, Mr. Brown told Ms. McLaughlin that he had no medication concerns and was not experiencing hallucinations (even when his injection was coming due). (Tr. 587.) He denied depression or irritability, was still working, and had started working out with his brother twice a week again. (*Id.*) His mother again reported concerns on the call, and a nurse noted that Mr. Brown had poor hygiene and his clothing had holes and stains. (*Id.*) But Mr. Brown said he was on his way to a job site to do demolition and construction work. (*Id.*)

In April 2025, Mr. Brown followed up with Ms. McLaughlin after a period of time where he had stopped taking his long-acting injectable medication. (Tr. 604.) He reported hearing some auditory hallucinations, but he was able to engage in reality testing and the voices did not give him commands. (*Id.*) He rated the severity as a 3.5 out of 10. (*Id.*) He was experiencing some anxiety and said he sometimes felt paranoia when he left the house. (*Id.*) He said his faith was a strong comfort to him. (*Id.*) On examination, Mr. Brown's thought content was unremarkable. (Tr. 605.) His mood was neutral or euthymic, and he made good eye contact and had full range of affect. (*Id.*) His speech and thought processes were unremarkable, and he was goal-directed and linear in his thoughts. (*Id.*)

### G. <u>Other Relevant Evidence</u>

Agency personnel who spoke with Mr. Brown to process his application noted that his "recollection of his work history and past life events is spotty," that Mr. Brown's mother assisted him in answering questions, that he said his memory issues were "due to his condition," and that his mother said he gets "overstimulated and stressed." (Tr. 419.)

## IV. THE ALJ'S DECISION

The ALJ found that Mr. Brown met the insured status requirements of the Social Security Act through March 31, 2022. (Tr. 15.) The ALJ further found that Mr. Brown had not engaged in substantial gainful activity since March 9, 2021, the alleged onset date. (*Id.*)

The ALJ next determined that Mr. Brown has the following severe impairments: (1) schizophrenia; (2) obesity; (3) diabetes mellitus; (4) dermatitis; and (5) hidradenitis suppurativa. (Tr. 16.) The ALJ further found that Mr. Brown had a non-severe impairment of a substance use disorder involving cannabis use, but she reasoned that cannabis use is not material to the decision because Mr. Brown had symptoms related to his mental impairments despite the absence of drug use during times in the relevant period. (*See id.*)

The ALJ concluded that none of Mr. Brown's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) The ALJ specifically discussed the "Paragraph B" and "Paragraph C" criteria of Listing 12.03 (Tr. 17–19), a discussion that is further summarized below.

The ALJ determined that Mr. Brown had the residual functional capacity ("RFC") to perform work at the medium exertional level with a number of additional limitations. (Tr. 19.) Specifically, Mr. Brown can never climb ladders, ropes, or scaffolds. (*Id.*) He can occasionally climb ramps and stairs. (*Id.*) He can occasionally kneel, crouch, and crawl. (*Id.*) He must avoid concentrated exposure to extreme heat and humidity. (*Id.*) He must avoid unprotected heights and the operation of heavy or dangerous machinery. (*Id.*) He must avoid very loud noises. (*Id.*)

With respect to non-exertional limitations, Mr. Brown can understand, carry out, and remember simple instructions. (*Id.*) He cannot perform work requiring a specific production rate pace, like assembly-line work, or an hourly production quota. (*Id.*) He can meet production requirements that allow a flexible and goal-oriented pace. (*Id.*) He can maintain the focus, persistence, concentration, pace, and attention to engage in such tasks for two-hour increments, for eight-hour workdays, within the confines of normal work breaks and lunch periods. (*Id.*) He can deal with no more than occasional changes in a routine work setting. (*Id.*) He can tolerate

occasional and superficial interactions with supervisors and coworkers, with "superficial" defined as "unable to mediate, negotiate, arbitrate, confront, or direct or supervise others." (*Id.*) He is further precluded from tandem tasks and interaction with the public. (*Id.*)

The ALJ found that Mr. Brown was not able to return to his past relevant work as a gas station cashier or factory laborer. (Tr. 25.) The ALJ concluded that Mr. Brown was 22 years old on the alleged disability onset date and had at least a high school education. (Tr. 26.)

The ALJ then determined that—considering Mr. Brown's age, education, work experience, and RFC—there were jobs that existed in significant numbers in the national economy that he could perform, including work as a "kitchen helper" (DOT 317.687-010), "linen room attendant" (DOT 222.387-030), "sandwich maker" (DOT 317.664-010), "mail clerk" (DOT 209.687-026), "office helper" (DOT 239.567-010), or "cafeteria attendant" (DOT 311.677-010). (Tr. 26–27.)

The ALJ therefore found that Mr. Brown was not disabled. (Tr. 27–28.)

## V. LAW & ANALYSIS

### A. <u>Standard of Review</u>

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id.* While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp.2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

### B. <u>Standard for Disability</u>

To establish entitlement to DIB, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

Consideration of disability claims for both DIB and SSI follows a five-step review process. 20 C.F.R. § 404.1520. First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 404.1520(b).

Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 404.1520(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which

he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 404.1520(g). *See Abbott*, 905 F.2d at 923.

**C. <u>Analysis</u>**

Mr. Brown raises two assignments of error, which the Court addresses together because they are intertwined.

Mr. Brown first argues that the ALJ erred at Step Three by finding that his mental health conditions do not meet or medically equal Listing 12.03 (schizophrenia spectrum and other psychotic disorders). 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.03.

"The Listing of Impairments . . . describes impairments the SSA considers to be 'severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.'" *Reynolds v Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1525(a)). "Each listing specifies 'the objective medical and other findings needed to satisfy the criteria of that listing'" and "[a] claimant must satisfy all of the criteria to 'meet' the listing." *Id.* (quoting 20 C.F.R. § 404.1524(c)(3)). "[T]he claimant must point to specific evidence that demonstrates [they] reasonably could meet or equal every requirement of the listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014).

A person meets Listing 12.03 by showing that (1) he meets both the impairment-specific medical criteria in Paragraph A of the listing and the functional limitations criteria in Paragraph

B; or (2) both the criteria in Paragraph A and the criteria in Paragraph C. *Id.*; *see also Scott v. Kijakazi*, No. 4:22CV878, 2023 WL 4010687, at *7 (N.D. Ohio June 15, 2023).

To meet the criteria of Paragraph A, medical documentation must show one or more of the following: (1) delusions or hallucinations, (2) disorganized thinking (speech), or (3) grossly disorganized behavior or catatonia. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.03(A). Here, the ALJ did not specifically discuss Paragraph A at Step Three (*see* Tr. 17–19), but there seems to be no dispute that the criteria are satisfied. Among other things, the ALJ found schizophrenia to be a severe impairment and acknowledged later in the decision that Mr. Brown said he "hears voices" and that medical evidence reflects "auditory hallucinations of whispering name." (Tr. 16, 20.) The Commissioner does not dispute that Mr. Brown meets the Paragraph A criteria. (Comm'r Br. at 7, ECF No. 9, PageID# 684.)

To meet the functional limitations criteria of Paragraph B, a claimant must show an extreme limitation in one, or marked limitations in two, of the following areas of mental functioning:

1. Understand, remember, or apply information.
2. Interact with others.
3. Concentrate, persist, or maintain pace.
4. Adapt or manage oneself.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.03(B).

To meet the criteria of Paragraph C, a claimant must show that their mental disorder is "serious and persistent," meaning that they have a "medically documented history of the existence of the disorder over a period of at least 2 years," along with evidence of both of the following:

1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder; and

> 2. Marginal adjustment, that is, . . . [a] minimal capacity to adapt to changes in your environment or to demands that are not already part of . . . daily life.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.03(C).

Here, the ALJ found that Mr. Brown has a mild limitation with respect to his ability to understand, remember, or apply information; and moderate limitations with respect to the other three Paragraph B criteria. (Tr. 17–18.)

Mr. Brown argues that the ALJ erred in her consideration of the last three Paragraph B criteria. He says that his ability to interact with others; to concentrate, persist, and maintain pace; and to adapt or manage himself is seriously limited, which should have resulted in a marked limitation in each. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2)(d). He further argues that Paragraph C is satisfied because, despite treatment, he has a minimal capacity to adapt to changes or demands that are not already part of his life.

Specifically, Mr. Brown contends that the ALJ's conclusions are based solely on isolated records showing that he "could allegedly prepare meals, read, and play video games." That is a gross oversimplification.

In coming to her Step Three conclusions on the Paragraph B criteria, the ALJ reasoned as follows:

> **The claimant has moderate difficulties in interacting with others.** Here, the claimant alleged that he has difficulty engaging in social activities . . . . However, the claimant also stated that he could get along with others . . ., shop . . ., spend time with friends and family . . ., and live with others. Finally, the medical evidence shows that the claimant was described as pleasant and cooperative . . . and appeared comfortable during appointments.
>
> **The claimant has moderate difficulties in concentrating, persisting, or maintaining pace.** The claimant contended that he has limitations in concentrating generally . . ., focusing generally . . ., following instructions . . ., and completing tasks . . . . On the other hand, the claimant also stated

> that he can prepare meals, read . . ., and play video games . . . . Additionally, the evidence contains no mention of distractibility and no evidence of an inability to complete testing that assesses concentration and attention.
>
> **The claimant has moderate difficulties in adapting or managing oneself.** The claimant asserted that he has difficulties bathing . . . . That said, the claimant also stated that he can handle self-care and personal hygiene. Meanwhile, the objective evidence in the record showed the claimant to have appropriate grooming and hygiene . . ., have normal mood and affect . . ., and not to have any problems with temper control.

(Tr. 17–18) (citations to the administrative record omitted).

With respect to Paragraph C, the ALJ concluded that the record as a whole (including the objective evidence and subjective reports) does not support that Mr. Brown has only a minimal capacity to adapt to changes or new demands. (Tr. 18.)

Mr. Brown does not identify any material misstatement or inaccuracy in the ALJ's summary of the record at Step Three—or, indeed, anywhere else in the decision.

Instead, Mr. Brown points to his own statements and testimony that he spends most of the day in a room by himself, has a hard time interacting with siblings, still hears hallucinations, forgets to turn the stove off, and only bathes once or twice a week. He also points to his mother's concerns, including those in her function report, that he was not bathing, shaving, wearing appropriate clothing, or associating with the right people. It is also true that a nurse on one occasion noted that Mr. Brown presented with poor hygiene and with clothes that had holes and stains, although Mr. Brown was on his way to a construction job at the time.

He cites the same evidence in support of his second assignment of error, in which he contends that the ALJ failed to sufficiently evaluate his subjective statements about his symptoms and their limiting effects. He says that the ALJ's analysis failed to address the totality of his symptoms, particularly the fact that he continued experiencing auditory hallucinations.

SSR 16-3p provides that the SSA will conduct a two-step process in considering a claimant's symptoms. 2017 WL 5180304, at *3 (Oct. 25, 2017). At step one, the SSA determines whether the individual has one or more medically determinable impairments that could reasonably be expected to produce the individual's alleged symptoms. *Id.* If so, at step two, the SSA evaluates the intensity and persistence of a claimant's symptoms, such as pain, to determine the extent to which those symptoms limit the claimant's ability to work. *Id.* at *4.

With respect to a claimant's subjective statements, SSR 16-3p provides that the SSA will "consider an individual's statements about the intensity, persistence, and limiting effects of symptoms" and "will evaluate whether the statements are consistent with objective medical evidence and the other evidence." *Id.* at *6. SSR 16-3p identifies seven factors that the SSA will consider in evaluating an individual's symptoms: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side effects of any medication; (5) treatment an individual receives or has received other than medication; (6) any measures other than treatment an individual uses or has used; and (7) any other factors concerning the claimant's functional limitations and restrictions. *Id.* at *7–8. "The ALJ need not analyze all seven factors but should show that she considered the relevant evidence." *Phillips v. Comm'r of Soc. Sec.*, No. 3:22-CV-01144-JGC, 2023 WL 4078204, at *8 (N.D. Ohio Apr. 4, 2023), *report and recommendation adopted*, 2023 WL 5602726 (N.D. Ohio Aug. 30, 2023).

Notably, "[a] plaintiff does not demonstrate a violation of SSR 16-3p simply by reiterating the same subjective symptoms she believes should have been credited by the ALJ, as an ALJ is not required to accept a claimant's subjective complaints." *Zingale v. Kijakazi*, No. 1:20-cv-02197, 2022 WL 824148, at *8 (N.D. Ohio Mar. 18, 2022); *see also Jones v. Comm'r of Soc. Sec.*, 336

F.3d 469, 477 (6th Cir. 2003) ("an ALJ is not required to accept a claimant's subjective complaints"). Moreover, "[i]t is for the administrative law judge, not the reviewing court, to judge the consistency of a claimant's statements." *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 171 (6th Cir. 2020). However, while determinations regarding subjective complaints rest with the ALJ, "those determinations must be reasonable and supported by substantial evidence." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007); *see also Kurman v. Comm'r of Soc. Sec.*, No. 1:20-cv-01837, 2022 WL 765072, at *3 (N.D. Ohio Mar. 14, 2022) ("The ALJ's decision . . . must be rooted in the record and must contain specific reasons for the weight given to the [claimant's] symptoms.") (quotations omitted).

Mr. Brown argues that the ALJ failed to consider his ongoing hallucinations and paranoia in developing the RFC.[4]

The Commissioner defends the ALJ's decision, pointing out that the ALJ relied on objective medical evidence and the opinions of the state agency consultants in determining that Mr. Brown did not meet the Paragraph B or Paragraph C criteria. He says that Mr. Brown's arguments fail to "address the ALJ's analysis in any significant way" and instead rely solely on Mr. Brown's and Mr. Brown's mother's subjective statements to the exclusion of the medical evidence. And he says that the ALJ's conclusions are supported by substantial evidence.

The Court agrees with the Commissioner.

Both of Mr. Brown's arguments ultimately boil down to a garden-variety "cherry-picking" argument: Mr. Brown says that the ALJ selectively highlighted certain facts while ignoring

[4] Mr. Brown makes a passing reference to his "chronic skin lesions," but he does not put forth meaningful evidence or argument regarding his physical health conditions. By only citing to this issue in a perfunctory manner, Mr. Brown has waived any argument related to his physical health conditions. *See, e.g.*, *Anthony v. Astrue*, 266 F. App'x 451, 458 (6th Cir. 2008) (issues referred to only in a perfunctory manner are waived).

evidence pointing to a disability finding, at both Step Three and when developing the RFC. *See, e.g.*, *Martin v. Comm'r of Soc Sec.*, No. 3:22-cv-1115, 2023 WL 4187387, at *19 (N.D. Ohio May 31, 2023), *report and recommendation adopted*, 2023 WL 4181296 (N.D. Ohio June 26, 2023).

The Court readily concludes that the ALJ did not engage in such "cherry-picking" here. The ALJ acknowledged Mr. Brown's testimony and his mother's concerns as expressed in medical records and in the function report. (*See, e.g.*, Tr. 17–25.) But the ALJ also accurately acknowledged that the record reflects that Mr. Brown repeatedly denied hallucinations while on medication (*see, e.g.*, Tr. 587) and reported that he was stable even in the context of significant family stressors (*see, e.g.*, Tr. 625).

The Court, having reviewed the record, finds that the ALJ's summary of the record throughout the decision is materially accurate and complete. Even in 2021, while Mr. Brown was experiencing auditory hallucinations, he was able to distinguish between reality and non-reality. (*See* Tr. 502.) He was engaged with other people, was helping around the house, and was sleeping well. (*Id.*) He denied being paranoid. (*Id.*) He expressed an interest in working again, and ultimately with medication he started working on a somewhat consistent basis doing construction work. (*Id.*; *see also* Tr. 587.) With adherence to medication, the hallucinations stopped almost entirely—for years. (*See* Tr. 508, 540, 511, 587). Mr. Brown helped friends move homes, and he was able to leave his own home to go out without serious issue. (Tr. 540.) He got along with family and had a consistent friend. (*Id.*) Even after stopping injectable medication for a time, Mr. Brown was able to engage in reality testing when it came to hallucinations, such that he rated the severity of his symptoms as only a 3.5 out of 10. (Tr. 604.) On mental status examinations throughout the relevant time period, his thought content was often unremarkable, his mood was neutral or euthymic, and he was goal-oriented and linear in his thoughts. (*See, e.g.*, Tr. 605.)

This evidence of Mr. Brown's ability to sustain work activity is readily distinguishable from the evidence in the cases Mr. Brown relies upon, including *Lorman v. Comm'r of Soc. Sec.*, 107 F. Supp.3d 829, 838 (S.D. Ohio 2015), where there was evidence of only "minimal self-sustaining household chores." Mr. Brown's activities of daily living clearly exceeded "minimal daily functions." *See id.* This is also not a case where the ALJ utterly failed to consider the quality and independence of a claimant's activities of daily living. *Compare Aubin v. Comm'r of Soc. Sec.*, No. No. 1:20-CV-02206-DAC, 2022 WL 138080, at *12 (N.D. Ohio Jan. 14, 2022).

The Court finds no material misstatement or inaccuracy in the ALJ's detailed, seven-page summary of the testimony and medical evidence. Tr. 19–25; *see also* 20 C.F.R. § 404.1529(c)(2); SSR 16-3p, 2017 WL 5180304, at *5 ("[O]bjective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms . . . ."); 20 C.F.R. § 404.1529(c)(3)(iv)(v); SSR 16-3p, 2017 WL 5180304, at *9 ("[If] the . . . extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, . . . we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record."). Further, Mr. Brown directs the Court to no records that contradict the ALJ's inherent finding that Mr. Brown's paranoid schizophrenia was stable and controlled enough on injectable medication such that he could sustain work activity within the relatively restrictive limitations of the RFC. To reiterate, the ALJ limited Mr. Brown to work that would involve only simple instructions, a flexible and goal-oriented pace, occasional changes in a routine work setting, no interaction with the public, and occasional and superficial interaction with supervisors and coworkers.

Mr. Brown directs the Court to no medical opinion setting forth a more restrictive limitation. And the ALJ's RFC is supported by the opinions of the state agency consulting psychologists.

In sum, the Court finds that the ALJ's conclusions—at Step Three and with respect to the RFC—are supported by relevant evidence that a reasonable mind might accept as adequate to support them. *See Biestek v. Berryhill*, 587 U.S. 97, 102 (2019).

There is thus no reason to reverse or remand, and Mr. Brown's first and second assignments of error are overruled.

## VI. CONCLUSION

Having overruled Mr. Brown's assignments of error for the reasons set forth above, the Court AFFIRMS the Commissioner's final decision.

Dated: November 10, 2026

/s/ *Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge